May it please the court. Good morning. My name is Tommy Goodwin. I'm from the Mississippi Attorney General's office and I represent the defendant appellant Sharon Hampton. In this case, this is an appeal from a jury's verdict in the northern district of Mississippi, finding that Sharon Hampton was deliberately indifferent to the plaintiffs, thereby causing their injuries. As the chief judge has said, I welcome any questions from the court and have waived my right to an uninterrupted argument for the first half of my time. The first issue that I would like to discuss is the fact that there was insufficient evidence at trial to support the jury's finding that defendant appellant Sharon Hampton was deliberately indifferent to the safety of the plaintiffs on the day in question. In this case, there was a general evidence or there was evidence of a general history of violence at the prison where this attack occurred. This attack occurred at the Mississippi State Penitentiary and Unit 32B is in Bravo in July of 2007. Are there any factual disputes that a jury had to know, Your Honor? And why is it a jury question if there are no factual disputes for him to resolve? And the only question is whether undisputed facts amount to deliberate indifference. Why isn't that a legal question that doesn't belong to the jury? It's a good question, Your Honor. Well, I know I wouldn't have asked you that. But I mean, I want an equally good answer. Thank you, Your Honor. Well, the jury, the question is a legal one, whether or not there was deliberate indifference. And the jury was free to make that determination based on the jury instructions that were given. But as the court has pointed out, there was there was no dispute about the facts in this case. So what's left of the jury? The jury made the incorrect determination that there was deliberate indifference. Legal determination is what I'm suggesting to you. Yes, yes, Your Honor. That's right. Can suggest otherwise. Tell me one wrong. Now, the jury, um, the jury at that point could not make a legal determination about deliberate indifference. You did move for rule 50, right? Yes, Your Honor. Well, so that meant you believe there was no, um, triable fact issue. Correct, Your Honor. In this case, there was there's evidence of a general history of violence. There was testimony that's undisputed that, uh, Christopher F said this facility was a dangerous place, and it was dangerous because on the day in question, the state of Mississippi housed its most dangerous inmates in this facility. Um, they, like every other state, has to make a determination of where to house and how to house their most dangerous inmates. In this case, this unit housed mostly gang members and inmates that were bent on committing acts of violence against each other. And there was evidence of that at trial. However, there was no specific evidence at trial of any specific acts of violence, in particular at the exercise pens where this attack occurred. And the issue that I think is most important in this case is what guidance does a general history of violence give to a correctional officer like Sharon Hampton on the day in question when she handed the block gun to Lieutenant Taylor and went inside to obtain a form? What does she know? She knew and assuming you impute knowledge of this to her, she knew she worked in a dangerous place with lots of dangerous men who have been on committing acts of violence. But what guidance does that give her? In this case, the only guidance that that gives her is don't ever make a mistake because you work in a dangerous facility that I'm not saying this is that it creates a strict liability situation, but it certainly creates a situation where negligence becomes actionable. Construct Council wasn't the jury given an instruction that said that mere negligence is not a sufficient basis upon which plaintiff may recover damages against the defendant. But despite what you say about mere negligence, they were instructed that they couldn't hold her liable for mere negligence. Isn't that correct? That's correct, Your Honor. They were. But negligence is a legal question, isn't it? Well, whether or not it was underlying facts or could be factual issues. But whenever you talk of negligence, you're talking about the law and not about facts, unless they're disputed. That's correct. The, um, in this case, as I stated earlier, she hands the block gun to Taylor and goes inside. And there was there was absolutely nothing going on on the yard that morning prior to that she was aware of that anyone was aware of any of the correctional officers were aware of that would give her pause to say, Wait a minute, there's a risk of harm present here. And yes, the United States Supreme Court and Farmer v. Brennan said that subjective knowledge can be proven with circumstantial evidence that violence was longstanding and pervasive. But the facts and Farmer and the facts in this case are very different. And Farmer, you had a preoperative transsexual who had a very youthful and feminine appearance. He was who did not want to be moved to a prison where there was a longstanding history of rape. In that case, prison officials have a very clear risk. That's apparent to them. One that in that case, there was evidence that they actually drew the problem. They drew the inference that this person was vulnerable. And and so they had a very clear risk that they were being faced with. And they had a lot of effects in this. Didn't the commissioner testify that unit 32 was designed to house the worst of the work? Yes, Your Honor. He said that he testified that they were that unit 32 held the most dangerous inmates in the system, separate and apart from just a prison population. That's what unit 32 was designed for. The worst of the worst, the most violent, the mentally ill, the members of gang leaders of gangs in particular. Yes, Your Honor. And there was further testimony that there was gang warfare going on as among the gangs that were housed in unit 32. Yes, Your Honor. In fact, the testimony was that they had basically been at war for some period of time that that's just the nature of gangs. They're attempting to impose their will on each other on a constant basis. But what farmer says about that, though, is is that you don't get to incarcerate people. And then just because they are violent, antisocial criminals, farmer says you don't get to just let nature take its course. Isn't that what farmers say? Absolutely, Your Honor. Absolutely. And in this case, but when you're talking about the difference between former prison officials faced with a clear risk that if we place this young transsexual in a prison where rape is longstanding and pervasive, there's a good chance he's going to be raped, and they recognize that in this case. What did Hampton know when she handed the block gun to Lieutenant Taylor? She knew she worked in a dangerous place and nothing more. There was nothing. Council. Excuse me. It seems to me that Commissioner Epps said a little more than that. He's specifically about the pins, and you're familiar with the testimonies in the brief. The reason you check them in these pens is because the inmates and then he says the pins are on a concrete slab and what they will do. They will take and make a shank out of the wire on the fence. They will. I mean, they could tear it up. And then he goes on and talks about the dangerousness. It seems to me suggesting by this, even the dangerousness in the pins, there is no evidence that there had been a breakout in the pins once unit 32 was moved into these pins and not just into open exercise. But there was apparently evidence of destruction within the pins, checking within the pins to see what shanks had been developed. So it seems to me your point is that until there had been a breakout in the pins, despite the violence otherwise and the efforts to tear apart the pins, there could not be deliberate indifference. I mean, you need a first incident. I'm not trying to be in any way catchy on something. I want you to help me understand what you think the law is in this area. Yes, your Honor. That's correct. The testimony that you cited is absolutely undisputed that they were taking pieces of the fencing. Inmates had taken pieces of the fencing, sharpened it against the concrete slab floor, and then to make shanks. I would submit to the court that inmates and plaintiffs expert even alluded to this or testified that inmates are creative, and he wasn't talking about parchment. He was talking about in his experience. Inmates are creative and can create issues and avoid security and do things that are in violation of protocols. And that is a fact of life in prison, whether it's in the pins or it's in their cells or it's in their job in the they will fashion weapons wherever and however they they can. However, the fact that they're fashioning weapons doesn't mean that they're using doesn't mean they're committing acts of violence with those weapons. How did they break out? They didn't break out with a shame. No, your Honor. The evidence is undisputed in this case that you had to inmates Hayes and I kicking on and sawing on. These pens are 180 square feet with the concrete slab and metal fencing walls, and they're single person pens. One inmate goes in by himself and at the bottom where the door and the slab meet. The Department of Corrections had welded a metal plate there, too, because there was a little gap between the slab and the door. They had melded welded a metal plate there to prevent people from escaping underneath the door sliding out. These inmates had sawed the plate and kicked on it enough that they actually got that loose and slid out from under. And Miss Hampton had no way of knowing that. It's undisputed that she had no knowledge whatsoever that anything was going on with the pens when she went inside. That sounds like the count of Monte Cristo. How long did it take him to saw through a well? There was some some dispute as to how long it took. I believe the testimony was that they there's some testimony that they did it in a matter of minutes, but I believe the the the ones that actually did it. So they've been working on it for some time. They go out to these pens on a daily basis to exercise construing the evidence in the light most favorable to the verdict. Is there evidence in this record that she did not, um, go for 1 to 2 minutes that she and she was not going to get a form at all because she didn't testify at the trial about the form and it was in the document and because she was gone for much more than 1 to 2 minutes that the jury could disbelieve her explanation that she went in to get a form because it was there was some inconsistency. Is that possible on this record? Or can you clarify that for me? It's not possible. And yes, your honor, I can clarify that. I believe that the plaintiff discussed that in their supplemental brief and at trial attempted to attempted to impeach Miss Hampton about that. And they said, Well, you said it. She testified at trial that she went in to get a form for one of the inmates, Samuel Williams, who's a plaintiff and because he was refusing to leave his pen and was holding up guard call until he got the form. So she ran inside to get it. That was her testimony. That's why she ran inside when she was when she was interviewed by the M. D. O. C. The Department of Corrections investigators right after this incident, she told them that she ran inside and I don't believe there was. She didn't give more detail to them, and I don't believe they asked. And so the plaintiffs attempted to try to say, Well, that's a contradiction that you didn't fully explain why you went inside. There were a couple of instances where the plaintiffs have tried attempted to create a contradiction where there was not one. She simply provided more detail as to why she did something in trial. And so the jury is free to make reasonable inferences. Absolutely. But they can't make unreasonable ones that amount to mere conjecture or speculation. And that's what that would fall into the category of your honor. Speaking about mere conjecture, speculation, can you address your causation point, please? Yes, Your Honor. In this case, she hands the block gun to Lieutenant Taylor, her supervisor. She goes inside while she's inside to inmates escape, and this attack occurs. The evidence is undisputed at trial. Samuel Williams, one of the plaintiffs, said he was in a pen right next to Lieutenant Taylor when it happened, and they were actually carrying on a conversation casually when it occurred. These two inmate attackers run up. He's sitting down when he stands up to face these attackers. He drops the keys to the pens, and that's that's very important point. We'll get to that in a second. He levels the gun, the block gun on these two attackers, and these guys are within a matter of feet from him. The testimony at trial was Samuel Williams said, Well, they were no more than from me to my attorney who was questioning him. So it's just a matter of 10, maybe 15 ft at most. He levels the gun. There's this moment where they confront each other. They stare at each other. Nobody moves, and then he flees for the inside. There was absolutely no testimony whatsoever that he attempted to fire the gun, that he seemed frustrated with the gun, that he said anything about the ammunition, that he checked it. All that is known is that he ran without pulling the trigger without even attempting to fire it. And so any inference drawn at that he didn't fire because he knew the gun was unloaded. There's no testimony or evidence whatsoever that he knew anything about that gun. It would be much more plausible to say that he thought it was loaded. He'd been out on fact, that's another important point in this is that it was undisputed that the person who checked out the block gun at the beginning of the day was responsible for loading the block and that during the day during yard call, the officers were not to open the block gun and check it because it's like a single shot shotgun. If you break it down to check it, you can't fire it until you break it till you put it back together. And the training that block gun is you cannot break it open during yard call because if you do, then you're vulnerable to attack from an inmate. And so everyone's operating under the assumption that day that Lieutenant Taylor, who checked the block gun out and who was first out there on yard call, had loaded the gun when he checked it out from inventory. And so you have Sharon Hampton believing herself that it's loaded because her and it would have been against protocol for her to even check it. And then you've got Taylor with the gun. There was no, no evidence that he knew the gun was unloaded and he just runs. You mentioned protocol wasn't protocol also that she would have to extra bullets for that gun. Is that right? That was protocol. Yes, your honor. She had those books. Yes, she considered. She thought about the fact that she had those bullets and then she decided not to hand them over. Isn't that correct? That's correct. The testimony is undisputed that does that indicate that? Oh, I'm sorry. I'll make it very brief. That's correct. Your honor. She made. She testified. It was undisputed. I thought I would go inside for a minute or two and get this form and come right back and that there and I could do so without incident. The difference is and it was a conscious decision. But in many cases where we're talking about deliberate indifference, conscious acts are still no more than negligence. That certainly weighs into the into the discussion that it was conscious rather than completely unconscious. But at the end of the day, it's still negligence because she didn't. She didn't didn't have noticed that anything was about to happen. She had no notice of any kind of risk on the yard that morning. All she knew was she worked in a dangerous place. One thing that's always troubled me about. Sorry. Judge Jolly had a follow up, I think. No, go ahead. Go ahead. Good. One thing that's always troubled me about this that even had Taylor had the extra two bullets in his pocket, he was attacked by two inmates and he shot the block gun and if it were loaded, there wasn't time based on the way the block gun works to shoot the second guy or that's always troubled me that that Miss Hampton never realized that risk. I mean, of multiple people breaking out of the pen and rushing the guards and it doesn't seem to me the block gun was designed to stop more than one person rushing a guard at the time. I mean, with their evidence on that point. Yes, Your Honor. There was extensive talk about the block gun, about how it was loaded, that it was a non lethal device. It was just like a single shot shotgun that you had to break it down and then to put in an extra pellet, bring it back together. And the testimony, as I mentioned earlier, was that these attackers were just a matter of from from this podium to the to the court from the officer. And so we had a single shot weapon and two men with homemade knives in their hands who wanted to kill him. And there's just no way that he could. I mean, he was at best going to be able to shoot one and then the other was going to stab him. The other was going to be on him and he was going to have to fight him off hand to hand. No, Your Honor. You said they wanted to kill him. Was there evidence that they wanted to kill Taylor? No, Your Honor. But they were rushing at him. I mean, they ended up taking Williams and Reed and Bynum out and stabbing them. Isn't that correct? Other and I'm sorry for any confusion. Taylor was not there in all be all target, but he stood in their way of achieving their goal, which was to kill the plaintiffs because he was on security with the block gun. When they escaped, he didn't stay there long. He got out of there and his testimony that's in the record said that he thought they were coming at him to kill him. And he threw the drop. The keys had no idea or intention of shooting him. He just got the heck out of there. And that's what he said. No. And all the speculation about what his motive was is nothing but pure speculation that is belied by his own statement, which is the only evidence in the record that represents what his thought and mentality was about leaving. That's correct, Your Honor. Nobody's mentioned that. Not you in your briefs or anybody had dug into the record enough to get his actual testimony that is in the record as to why he did not fire the gun or why he left. Then they came to the door. They started beating on door, threatening to kill the guard that was in the door. So no, they were not benign, as Judge Graves might suggest, benign people looking for help. Yes, Your Honor. One thing that is perplexing for me in your argument is that I think I'm correct that you accept farmer. Your opponent accepts farmer. The deliberate indifference instruction was given. No one's opposing it. When I read this whole trial record, especially Ms. Hampton's cross examination and then the intense closing arguments, it seemed to be that in your response to Judge Jolly's first question, it's difficult because she insisted throughout it was a mistake. The cross examination was, no, it's not. She said, well, if anybody's at fault, it's Lieutenant Taylor. Then at closing argument, same issue. The whole closing argument battle in front of the jury is, jury, you've got to decide, is this negligence or is this criminal recklessness? Then this would be my question for you. As I read it, the expert for the plaintiffs, I'm not sure how you pronounce his name, Heffelby . . . I believe it's Lawrence Heffaley. Heffaley. He specifically opines on the ultimate issue of Sienta. This was deliberate indifference, and there's no objection. You tried to keep him out, but he ends up testifying, and it's not an issue on appeal. So what's the point of the trial if the position now is that this could never even have been a disputed fact? Well, certainly, you're correct. There was no objection. The attempt was made to exclude him as an expert, and there was no objection to that testimony, I don't believe. I believe, Your Honor, you're correct on that. However, there was also testimony by the defense expert, just the opposite. Right. Certainly, the jury can make a determination about that. But your position has to be the jury can't make it. That's got to . . . I mean, I don't want to put words in your mouth, but the whole trial was about this Sienta question, as I read it. I'm not sure that I completely agree with you, Your Honor. I believe that there was insufficient evidence to prove it, but I don't believe that the jury . . . I just believe there was insufficient evidence to support the verdict on that point. Once the evidence is in, you've got to play it as it lays, right? Correct, Your Honor. And again, we have a prison that is . . . and every state has to make a determination about where to house their most dangerous inmates. And does this create, or would an affirmance of this verdict create a situation where the most dangerous facility in Texas and the most dangerous facility in Louisiana, where they would be almost strict liability for the correctional officers working in those facilities? Because when Christopher Epps sat on the stand, it was a dangerous place at that time that he was speaking the truth. And I believe any prison official or superintendent or commissioner in Texas and Louisiana, when talking about the unit where they keep their most dangerous inmates, would have to admit the same thing. All right. But that doesn't mean . . . Finish your sentence. Thank you, Your Honor. But that doesn't mean that there's a specific enough threat or there's knowledge given to the people that are running that prison sufficient that they can make decisions to avoid a risk. It creates a situation where negligence becomes actionable under 1983. All right. Thank you, Mr. Goodwin. You've reserved rebuttal time to come back up. Yes, Your Honor. Thank you. All right. Thank you. We're going to hear now from Mr. Fletus. Is that correct? Good morning, Your Honors. Good morning. And may it please the Court, my name is Victor Fletus from Tupelo, Mississippi. I'm here on behalf of the plaintiffs at Belize in this case. After a long and hotly disputed trial in which practically every question that arose during the course of the testimony was disputed, during which time the jury and the judge had the opportunity to gauge the credibility of the witnesses, whether or not those witnesses had been impeached, whether or not those witnesses' recollection was strong or not, a jury who was properly instructed, there was absolutely no objections, this case presents an absolutely clean issue of a properly instructed jury on the proper standard, deliberated for several hours and concluded, based on interrogatories, that Sharon Hampton was deliberately indifferent on July 27th of 2007 at Unit 32B in Parchment. That conclusion by the jury is supported by more than just a mere scintilla of evidence. There was sufficient evidence in this record, a hotly disputed record, from which that jury could make the conclusions that it drew and so find. But, now . . . Yes, Your Honor. Can you explain to me why I'm incorrect in saying that, ultimately, deliberate indifference upon undisputed facts is a legal question, admitted that it's a legal fact question up to a point, but ultimately it becomes a legal question? Only where facts are absolutely undisputed. What are the disputed facts? The disputed facts here that I think . . . that do raise a fact question are the factual issues regarding Sharon Hampton's subjective awareness of the risk. What exactly was the risk presented by her taking the two pellets inside with her? What was her . . . what risk did she perceive precisely? She perceived the risk that there would be something happen and there would be no ammunition to protect a co-worker or another inmate. That is the specific risk that she took and that she was aware of when she went into the break room to retrieve that form. Was there any evidence of any specific information that would have led someone to think that more than likely something's going to happen today or tomorrow or this week? Any specific, other than just a general history of violence, do we have anything specific that would have put the guards on alert that something's going to happen? Separate and aside from the general conditions of violence in Unit 32, which is a heightened level of violence from anywhere else I would suggest and probably at that time anywhere in the country, Commissioner Epps testified specifically. This attack was going to happen to your clients, either on the yard, in the cells, walking to and fro. He described the attack on the plaintiffs as not a possibility but as an inevitability. At some point in the future, indefinite. He said a dangerous prison, you're going to have, that's what he said. He was specific about the fact that this was going to happen to your clients either out on the pens or somewhere. I understand he didn't say this is going to happen tomorrow and I understand he didn't say it might not be a week from now. There was also testimony from Ricky Scott . . . Before you go on that, could I say there's no testimony that Sharon Hampton would have known that, that these plaintiffs were at particular risk or even that Chris Epps knew it at the time. What is there . . . it's one thing looking back at it and saying these gang fights are going on and these particular people were at it, but what did Sharon Hampton know at the time is what we need to focus on. What is there to support that? Well, I think what's there to support is her admission that, yeah, I went in there with the ammunition leaving an empty block gun and I knew I shouldn't have, but I didn't think I would be long. Let's stay in order. All right. Finish up on the question with Judge Salford and then we'll follow up. I'm trying to tie what she knew about what you said just a moment ago in response to another question that the injuries to these plaintiffs were bound to happen. Is there any evidence that she knew that level of No. She wouldn't have known specifically targeted to those three individuals and I think Epps' testimony goes to every inmate out there in those pens, given the fact that security threat group officer Scott who testified said, aside from the fact of everything else, there was an ongoing . . . separate from the fact you've got violent gang members here, there was specifically a gang war going on at that time and testimony from that a loaded semi-automatic pistol was found in unit 32B within a week prior to this incident taking place and I believe Commissioner Epps stated he felt it was connected somehow to this incident. The only point I was going to make is that it's a misstatement as contained in the opinion as well that she had knowledge that the gun was unloaded. There is no evidence at all and it's a conceded fact in this court that there was no evidence that she knew the gun was unloaded. There is no direct evidence or admission from Sharon Hampton that she knew the weapon was . . . There is no evidence of any kind. I believe that there is . . . Unless you can tell me. . . . that a jury is entitled to draw the inference that she . . . Out of thin air? I don't think so. Out of the fact that there were two rounds and the gun was empty and that she had a standing post-order obligation to retrieve that weapon, her refusal to check it constitutes willful blindness. Where was the third pellet? There was no third pellet, Your Honor. Unfortunately, it's not part of the record, but Sharon Hampton in her deposition said we had gone from three to two pellets. Hadn't she already . . . as I understand it, there have been several shifts on duty that day and the first . . . at some point she relieved Taylor, right, of her supervisor, right? I dispute the fact . . . in fact, he was not her immediate supervisor. He was a lieutenant supervisor, but she was answering to, I believe, Lieutenant Whitehead. Okay, but he had a higher rank than she did. He did. Okay. That's correct. Now, let me ask you just a practical question. Yes, ma'am. Obviously, Taylor is the person who dropped the keys. He did. Without which, access to these victims would not have been possible. So, why didn't . . . you took a default judgment against Taylor, is that right? I can spell it out for the Court, Your Honor. There were a series of what we would constitute were delivered in different acts by various defendants, including Johnson and Lieutenant Taylor. Yeah, and a bunch of them were dismissed. So, Taylor was your . . . the natural target. So, I guess you took a default and he's judgment-proof or not . . . you can't find him or something like that. The Department of Corrections made a decision to not tender him in defense and is going to assert that they have no duty to indemnify him, but that's an issue for a later date. So, basically, it's Mississippi that would pay for Hampton's verdict. Pursuant to our Tort Claims Act, yes, the judgment would have to be authorized by the legislature. They would have to pass a special bill in order to fund any judgment in this case. Why don't you go after whoever was supposed to inspect those welds? Those were . . . that was Mr. Davenport. We did bring Mr. Davenport to trial and Mr. Davenport was dismissed on a Rule 50 motion. We did take him to trial, Your Honor, and he was dismissed by Judge Aycock on a Rule 50 motion. And it's not appealed? We did not appeal. No, Your Honor. That seems very strange to me because you can't even have an incident without a breakout. Let me ask you a question. Yes, Your Honor. You acknowledge that the pivotal point here is the awareness, the conscious disregard, the state of mind, the subjective element of Lieutenant Hampton, correct? Yes, Your Honor. All right. I've read the examination of Ms. Hampton, the cross back and forth, et cetera. My impression, she may have been combative. She didn't remember what was in the deposits, et cetera. But I don't see where you queried her about what her awareness was about the condition of the prison, the specifics of the pen, et cetera. The breadth of this testimony goes back and forth about the blocked gun, the one pellet. Why did you go inside, et cetera. It just goes on ad nauseum, really. Given that that's a critical piece here, maybe not dispositive, but a critical and subjective element, is it your argument that the expert can supply the mental status of Ms. Hampton through his testimony on the ultimate issue when there is no testimony elicited from her about her state of mind on this issue? Do you follow my question? The testimony developed, the line of questioning developed by the state was this was just a mistake. No, no, no, no, no, no. I want you to answer the question I asked. Yes, Your Honor. Not some other question. All right. Stay with me. Stay with me. I'm saying you've acknowledged we're pivoted on the subject of Elvin. My question is, this is her testimony, back, front, otherwise. I'm saying in the questioning, there is no question by anybody, at least that I saw, about what's in her head about the state of the prison, the pen, the whole nine yards. I don't see that. I'm asking, given as Judge Higginson asked, that your expert testified on the ultimate issue without objection. I'm asking, is it your theory of our affirming this that the expert can supply, i.e., the dangerousness of the prison, et cetera, et cetera, for the jury, something that she was not questioned about? Do you follow what I'm saying? Yes. Can you prove that up indirectly through the expert testifying on the ultimate issue, something that was not elicited about what she knew and when she knew it? You absolutely can, Your Honor. Through the testimony of Lawrence Hafley, not just about the general conditions, the testimony of Commissioner Epps regarding the inevitability of committing extreme violence there, and from Lawrence Hafley's testimony on the stand, which was not objected to, that Officer Hampton said she knew she shouldn't have gone in there with those . . . But that is my question. How would that be appropriate for the expert to opine on her state of mind on the ultimate issue? The way that he was able . . . What's the authority that allows that to supply the deliberate indifference? Do you have a case? No. Well, because . . . I'll interrupt then because in the appellant's reply brief, they cite heavily our Adams versus Parisi decision. Yes. But in your supplemental, you didn't mention it. That case is overturning a jury verdict on very similar circumstances. Even if I'm anguished that this looked like it was exactly what the jury was being presented, we've got powerful precedent that would be contrary to the position you're urging. I think that the panel decision in Cantu v. Jones, Your Honor, would be the appropriate measure for what the standard is for this court on appellate . . . But what's your opinion on Adams versus Parisi? Perez. Is that how it's pronounced? Thank you. I'm sorry. Adamis? Adams versus Perez, which . . . Yes. Yes. How would you distinguish that case? Because all the district courts that follow it say it's got to be a known, a known case. Can you walk away from it? Well, I believe that the expert testimony here by Haefeli, the testimony presented by Epps . . . Let's be clear. The state, the Department of Corrections defended Hampton by saying this is such an extremely violent environment. It is so inevitable. This is their trial strategy. It is so inevitable that you can't blame Officer Hampton because these total absolute criminals . . . That was their closing argument.  Okay. . . . have done this. So they set the standard and showed the excessiveness of the data. They just said she made a mistake. And they defend it by saying this is just a mistake, nothing to see here. And the jury having heard all of the testimony from Haefeli, from their expert witness, all of the testimony said she's not believable. We don't believe her. You can't work at Parchman eight years. You can't have post orders that say don't do exactly what you did. Why didn't you ask her about that? I mean, I know it's dangerous to ask a white question, but, I mean, you had her. I mean, I'm not necessarily suggesting it's fatal, but it just striked me in reading it that she's asked about all kinds of things, but she does not ask about that issue. We wouldn't have to indirectly get there to what she knows. Did you have a strategy to not answer it, or is it the 101 don't ask the question you don't know the answer to? Your Honor, I will answer that question and say this. After having read the examination of Hampton, she was a very combative witness. There were numerous times she was impeached. She didn't come across as credible. I could look at that jury and see that they probably didn't believe a word she was saying There was a bench conference after an objection by Mr. Irvin, trial counsel in this case, along with Mr. Goodwin, where Judge Aycock basically said, look, we can be here all day. I think the jury's got it. I think they see what she's saying and what she has said before, and we could be here all day. That's my point. I get that, but you ask her nine times about the bullet. If she's that combative, it seems to me she's playing right into your hands. If you ask her once and she goes over it, in terms of that, you've got her in the record. You impeached her on her deposition. It's not clear to me that in the deposition she was asked about it. It's just a curiosity that a pivotal piece of her awareness is not asked in the deposition, not asked when she's on the stand, not on redirect to where she's confronted with. Once you had her, it's clear to me from the testimony, she was a difficult witness, et cetera. Maybe that's why the jury came down, but I just want to understand how you get there. I guess your answer to me is that you had the expert testimony, so you didn't go there, and what your argument is that the jury and the court could find that the experts applied what you did not ask. Is that . . . We had Epps. We had Hayfleet. We had Hampton, and considered that sufficient. There's a fine line you draw when you're in front of a jury between being seen as beating up a witness and letting some things . . . Up in North Mississippi, the manners thing matters, and how you come across in your treatment of a witness matters. At some point, it could prove to be detrimental to beat up on a witness. It could develop sympathy. That's probably not limited to North Mississippi. You're correct, Your Honor, but I know that we hold it very highly up there, and it's always a consideration of what we do. I've been there. Yes, Your Honor. Certainly, you have. Counsel, back to Davenport, and you can correct me if I'm wrong. I thought the judge in dismissing Davenport from the lawsuit made a determination that he had done an inspection, but that it was so remote in time from this incident, and further, that he had no responsibility for doing daily or weekly inspections. Wasn't that the basis for her determination that he ought to be dismissed? It was. His inspection was approximately 45 days prior to this incident. To address the issue of the pens, the testimony from inmate House, which is in the record, was that the pens were not hard to get out of. That is in the record. His testimony was this wasn't hard to get out of. It didn't take much to get out of these pens, and I think that corroborates what Commissioner Epps understood, was that, yes, we've got these pens, but really, they don't make that much of a difference. Mr. Plate, what's in the evidence about how long these pens had been used as a substitute for a more open outdoor period, and whether anybody had broken out of them before? There's nothing in the record. The pens were erected sometime after a consent decree was entered into by the Department of Corrections at Unit 32. It was supposed to be a palliative measure, but we don't have specific information to a tax out on the pens. We do not. The testimony of Sharon Hampton was, I've got to be careful out there on the yard all the time, because inmates are always going to try to grab stuff from me. So clearly, there was a knowledge on her part that out on the yard with these pens or not, I've got to be, I've got to have sort of cat-like awareness of any potential danger that may be out there. Do you think that pellet gun is going to help against somebody who's charging at you immediately? A pellet gun is classified as a nonlethal weapon, Your Honor. One of the inmates, I think, boldly and brashly testified, well, it doesn't hurt that much. Having a . . . actually, there was a . . . you can be killed by a shot from a 37mm pellet gun, but it stopped them. It did stop them. They hid behind the pens and held them. The brandishing of it, what do you say about what Judge Jolly pointed out about Taylor, that he just fled? We could probably call Taylor a coward. We could probably say Taylor . . . But you don't disagree with that? It is weak enough. You don't disagree that that's in the evidence? What? No, I don't. I think the Exhibit 4, the report that was admitted into evidence that Judge Jolly is referencing does indicate that Taylor testified that he panicked. I think there was . . . I didn't know how many guys were out there, so I . . . As I looked at the pens, I saw Lester Nash and Derek Hayes running toward me carrying homemade weapons. Inmate Nash and Inmate Hayes told me they were going to kill me. I raised the block gun and pointed it in the direction of both inmates. Inmate Nash and Inmate Hayes hesitated, and I, not knowing how many inmates were out there, decided to run inside the building. That's correct, Judge. I admit I panicked and somehow dropped the keys to the exercise pens. So it wasn't a matter of speculating what motivated him. That's the only evidence that clearly indicates that the guns and the bullets had absolutely zero to do with the ultimate incident that occurred. I wouldn't say that it was zero, because we don't know whether or not he was aware it was unloaded. No, he doesn't say that, does he? He didn't even pull the trigger. Even if he had shot one, the other guy is still there, too. Absolutely. He didn't know how many more were coming. He knew that. Well, the defendant's expert testified, if the question is, well, where's the causation here, then we go into, number one, causation is a very factually based inquiry. Number two, there was no supersedition. It's a legal question, though. Causation is another legal question. The question of . . . there are questions, perhaps, that the defendant is attempting to raise on appeal as to superseding cause, that is, perhaps Lieutenant Taylor's cowardice is the superseding cause. There was nothing tendered to the jury from which they could arrive at that verdict. Well, to me, it goes to the risk that Hampton perceived. Was there any evidence that Taylor could have shot, had the gun been loaded, shot one of the rushing prisoners, reloaded and shot the other in time to save himself as well as the other prisoners? Any evidence at all? That he could have done that? Yes. That had he had two more pellets, had the gun been loaded, these two guys were rushing him, they were in close proximity with weapons, that had he shot one, he would have had time to reload and shot the other and thereby prevented . . . I mean, I'm trying to get what Hampton thought the risk was when she took the pellets in. I can see her maybe thinking, I'm leaving Taylor in a vulnerable position, but I don't see how she thought that without these two extra pellets, two prisoners could escape and rush Taylor and he's going to drop the gun and they're going to get the keys and let the inmates out. I mean, I don't . . . there's no . . . I don't see what made her think through that risk. I don't know that she's required to have spun this yarn out that far before she made a conscious decision to take the only ammunition for the block gun . . . But what is the evidence that Taylor would have had time to shoot one, reload and shoot the other that were rushing him? In this trial, none. Taylor was a party in default in the issue. Well, was there expert testimony that, yes, that guard, a guard standing there could have shot one of them and reloaded and shot the other when they were both rushing him? Neither the defendants or the plaintiffs tendered expert testimony regarding the role of Lieutenant Hampton. Lieutenant Taylor, I'm sorry. But I thought there was undisputed evidence about how long it took to break down the gun once it had been fired and reloaded and that the policy was not to break down the gun . . . The policy was to not open up the weapon in the presence of inmates. And that is because . . . And that is because, according to testimony, they will try to grab the weapon from you while it's in an unloaded state. So it's been shot. You can only shoot one at a time. You shoot one guy. You break it down to put in the other. Where can the jury draw . . . infer from that that there would have been time to shoot once, break it down, put another pellet in, and shoot the second guy? I don't know that the jury could have drawn that inference. The inference that the jury drew was that the absence of any ammunition in the block gun was causally related to the harm caused to these plaintiffs. But there's evidence that Ms. Hampton knew the gun was unloaded. I think the jury was free to draw that inference from the evidence that was produced at trial. I took the two rounds in with me. I didn't think it would take me very long. The record evidence shows she'd already been in there five or six minutes at the time that the attack occurred. Okay, but that's the two pellets. What evidence is there she knew the gun was unloaded? Not about the two pellets, but the gun was unloaded. Direct evidence that she knew the gun was unloaded. No direct evidence that she knew the gun. No admission from her. There is none. She did not admit. Is there anybody else who says . . . I mean, wasn't Taylor the one who originally checked it out and should have checked it? That's a disputed issue. How long she was out on the yard that day was hotly disputed. She testified that she was the yard officer. She testified that Taylor was the yard officer. She testified she was only out there a small while. Her report to her superiors in corrections was, I was out there virtually all day. Let me come at it this way. Other than the evidence that the gun actually was unloaded, was there any other evidence of any kind, substantial, direct, anything, that she knew it was unloaded? I believe her statement where she directly admitted, I took the two rounds with me thinking I would be right back. How does that show the gun was unloaded? It doesn't directly show, but I think a jury engaging her testimony and her saying that and knowing that the gun was unloaded could draw the inference that she was taking a risk and aware that the gun was unloaded. Again, we're talking about reasonable inferences to be drawn from the facts. I don't understand how the inference that she has two extra bullets in her pocket tells us the gun was unloaded. I'm just not getting that. But if that's it, that's all I need to know. But I'm not getting that inference. I understand. And I don't know that I could clarify it any more for the court than . . . Wasn't the practice to have three rounds? It was not testified to at trial. Actually, in her deposition, she testified that we had gone from a three-round system to a two-round system. And that's borne out by the fact that there were only ever two rounds. I have a question about causation. Yes, ma'am. Is there only one motion for judgment as a matter of law with regard to Ms. Hampton? And that motion seems to address only the deliberate indifference to the safety. So I'm wondering if there is a Rule 50 motion about causation. But if there is not, I'm wondering if you've waived any objection thereto because your second heading of your brief says the district court properly overruled the defendant Hampton's objection for judgment as a matter of law in light of ample evidence that her acts and omissions caused injury. So can you answer those questions? Yes, if I remember correctly. There was a Rule 50 motion filed at the conclusion of the plaintiff's case on behalf of Hampton. Causation was one of the questions. It was raised post-trial. But it's a different motion than I'm reading from right now that only mentions the deliberate indifference. Is there a separate one on causation? I believe it was addressed in the court's opinion, Your Honor. The question of causation, and it was raised on their—the question of qualified immunity was not—was, we would argue, waived. But I believe the causation issue is properly before the court and was argued. Yes, Your Honor. Counsel, would a post-order—did the post-order require her to check the gun? The post-order required her to check the weapon upon its receipt and relinquishment. And according to her varying testimony, because she testified several ways about this, she either got the weapon once from Taylor or got the weapon twice from Taylor that day. And the post-order was specific. You must check the weapon when you receive it to make certain that it's loaded. And you must give the ammunition in your possession to your fellow correctional officer whenever you receive or the weapon is relinquished. Taylor did not check it. Taylor did not check it also. He was obligated to do it, and that's one of the reasons that he was disciplined or whatever happened to him. As was Sharon Hampton, correct? As Your Honor. Those duties extended to both of them fully and equally, irrespective of their status as supervisors or anything else. Were you supposed to check it if you were on the yard? You were supposed to check it as soon as there wasn't an inmate in proximity to you being transported. When they're in their pens, and Lieutenant Hampton testified, I was out there all day. I was the yard officer. They're in their pens. You had a duty, as long as there wasn't an inmate, a chained inmate being walked past you, to pop that open, take a look inside of it, and if it's not loaded, push around in there, close it back up, and do your duty. And that's what she failed to do. How many inmates have been in and out during that period of time? They go by tiers. There were 28 pens. I do not know if every pen was loaded. I do know that they just don't have inmates constantly being brought in and out because they go in tiers. So once you get one tier in and they're all locked up, and you're sitting there for several hours, you pop the bad boy open, you take a look, you do your job. And when you don't do your job like that, the post order tells us people may be killed. And Sharon Hampton realized that people might be killed if she didn't do her job. The post order doesn't set the standard, but it does speak to her subjective awareness of the risk of harm. If you've got 16 seconds, you can use them or lose them. Your Honor, I would respectfully request that this court affirm the verdict of the jury in all respects. All right, thank you, Counsel, for your briefing and argument. Rebuttal, Mr. Goodwin, you've got five minutes. Thank you, Your Honor. Counsel Offset said earlier, in response to the Adams v. Perez case, that, well, he did not address that directly, but said, well, Cantu is controlling in this case. Cantu is a very similar case and is very instructive in this case. Cantu is very factually different. In fact, in the Cantu case, as this court is aware, the allegations were that the prison officials actually orchestrated the attack. It went far beyond just deliberate indifference to inmate on inmate violence. The claim was, yes, an inmate attacked me, but he attacked me because the prison officials themselves orchestrated the attack using him to get back at me. But, Counsel, isn't Perez factually different as well? What we had in Perez was three different correctional officers that the court made very specific findings as regards all three. All those findings had to do with what they knew about inmate on inmate violence. Then, as regards one of the officers who had received some e-mails, the determination was that he had no basis based on those e-mails to draw an inference that these particular inmates was in some kind of danger. Factually, we're talking about something different, aren't we? That's based on what they knew. But, in the case in Cantu, though, that he is citing, it went far beyond the deliberate indifference. It was an orchestrated attack according to the plaintiff in that case. Adams v. Perez is very similar to this case. That's certainly something I've cited in my brief. Except, you didn't make any hay in this case about what Sharon Hampton didn't know, did you? Oh, certainly. We've said that she did not ... Well, did you ask her on direct examination to tell us that she didn't know about Unit 32, its history of violence, the danger of inmate on inmate violence? Did you ask her to say she didn't know about that? I did not examine Ms. Hampton, but the questions were not asked, I don't believe. I've read the record a few times. There were no questions about that, but ... It might have been the fact that there's no case that's ever held that inmate dangerousness alone can substitute for ... Do you have a question? No, I was just helping Judge Graves out. Yes, Your Honor. I would also like to address, Your Honor, that there was testimony that Epps said, well, these attacks were inevitable. These attacks were inevitable. The testimony's clear when you read his entire testimony, that he was speaking about gang violence in general. That gang, he said, blood in, blood out. These gangs are constantly trying to attack each other. This is not ... Well, but, Counselor, on the blood in, blood out, that's where if you're trying to get out of a gang or you renounce your gang affiliation, then other gang members decide that they should kill you. Isn't that what he meant when he was talking about blood in, blood out? He did not explain exactly what he meant. Well, isn't there evidence in this case that Williams and Bynum had renounced their gang affiliation and had participated in a program at the prison, a renunciation program? That's what they testified to. Yes, Your Honor. All right. Well, suppose Ms. Hampton was supposed to have had some tear gas in addition to this one bullet in the gun which Taylor dropped, would she be liable because she didn't have her tear gas? No, Your Honor. It would have been a violation of policy. Or if Taylor didn't have his tear gas, whoever was there. No, Your Honor. It would have been a violation of policy, assuming the policy said you had to have your tear gas on you at all times and use it in certain circumstances. But a violation of policy isn't enough to prove that there's a deliberate infliction of punishment under the Eighth Amendment, either. Absolutely, Your Honor. And that's why we're here today, I believe, is that . . . Counsel, there's a lot of focus on the bullets sort of falling off from that. If she had taken the block gun itself in, deliberately, without adding the word indifferent to it, deliberately took it in knowingly, doesn't that change the case to leave him out there with no weapon at all? That's certainly a hypothetical that . . . it would make her actions more egregious. But I think you still do not reach deliberate indifference without some indication, some indication to her that there was a risk that inmates were going to escape those pens and attack someone. And Plaintiff's Counsel has admitted there was simply no evidence of that, that she simply knew she worked in a dangerous facility. What was the testimony about her obligation to check the gun out on the . . . you heard counsel say that? Your Honor, I'm out of time. I would love to respond to that question. And you . . . as I was saying, the red light doesn't say, please respond to Judge Alonso. Thank you. Your Honor, the plaintiffs attempted to, again, show that there was a contradiction somehow in what she had stated to the investigators versus what she testified to. She stated to the investigators, and it was put in the report, that she said, I had been . . . it was not clear, admittedly, but she said, I had been on yard call since, I believe, early that morning or something to that effect, since early that morning. She did not say, I was the first one out there. She did not say that she'd been on . . . it was just, I had been out there since early. It was undisputed that yard call was ongoing when she arrived to work that morning. And Lieutenant Taylor was already on the yard with the block gun, providing security. And when she was told . . . originally, she was told to go be a terror officer. And then those words were changed, and they said, no, go to yard call and help with yard call. You get to answer a question, but you don't get, you know . . . Yes, Your Honor. Somewhere, I was waiting on a period. I'm sorry. I'm sorry. We've all been living with this case for so long, it's hard to stop talking about it. Thank you, Your Honor. All right. We appreciate the briefing and argument of counsel in the case. This concludes the oral argument. The case may be submitted.